UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **M. JACOB & SONS,**  Plaintiffs,  vs.  **PURE STEEPS BEVERAGE, LLC,**  Defendant. | 2:21-CV-10230-TGB-RSW  **ORDER GRANTING MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS** |

Before the Court is a contract dispute between a glass bottle supplier, M. Jacob & Sons ("MJS"), and its customer, Pure Steeps Beverage, LLC, ("Pure Steeps") a company that manufactures the fermented tea drink kombucha. Pure Steeps' bottler experienced breakages when using bottles supplied by MJS on the production line, so the two sides signed a Testing Agreement outlining a plan to determine whether the bottles were defective and setting conditions governing whether Defendant would have to accept delivery of the rest of its purchased bottles. Based on the results of initial testing, MJS argues that Pure Steeps is required to conduct a sample test run in the bottling facility. Pure Steeps has thus far refused to go forward with the sample run, and Plaintiff filed this partial motion for judgment on the pleadings specifically as related to this portion of the Testing Agreement. For the following reasons, Plaintiff's Motion is **GRANTED.**

1

## I. BACKGROUND

Plaintiff MJS is a Michigan corporation doing business as Riekes Container. It supplies glass bottles to Defendant for the bottling of its kombucha drink product. The bottles at issue in this case come from a purchase order that was first initiated in September 2018. ¶ 6, ECF No. 1-2, PageID.11. Defendant's product is bottled by non-party Yoshida Foods International, which at some point in 2019 reported experiencing excessive breakage when using the bottles provided by MJS. *Id.* at ¶ 10.

Defendant did not wish to take delivery of and pay for bottles that appeared to be flawed. On September 25, 2020, the Parties signed a contract, the "Testing Agreement," to resolve this issue. Ex. G, ECF No. 16, PageID.270. This contract outlines a two-step diagnostic process to determine whether the bottles were indeed defective. First, it describes a set of tests that third-party research firm AGR was to conduct on a sample of bottles from the relevant shipment "as soon as possible during the month of October 2020." *Id* at PageID.271. This testing was completed on December 9, 2020, and the results are attached to Plaintiff's Motion. Ex. H, PageID.277. If bottles from a given "cavity/production date" passed the tests by meeting the agreed-upon specifications, then a larger test run involving 26,400 bottles would be conducted with the opportunity for representatives from each party to observe the test.

Section 1 of the Testing Agreement describes a series of tests to be run "to diagnose the cause of the glass breakage reported by Yoshida

2

Foods." ECF No. 16, PageID.271. These include Surface Protection Evaluation, Dimensional, Thermal Shock, and Internal Pressure Testing. This section also notes that the while the testing is for diagnostic purposes, the results of the testing "will be final and binding" for the purposes of deciding whether to undertake the larger test run. Section 2 has instructions on selecting bottles for testing to ensure the provided bottles comprise a representative sample of the lot of bottles purchased by Defendant, while Section 3 provides further specifics on how the testing shall be conducted.

Section 4 of the Testing Agreement outlines the second part of the diagnostic process:

> To the extent bottles from a given cavity/production date pass the tests to be performed by AGR (that is, meet the Specifications), then Riekes shall provide Yoshida with 6 pallets (26,400 bottles) from an even sample of the cavities/production dates so that a sample bottle run can be performed at Yoshida's facility.

ECF No. 16, PageID.273. The "Specifications" were attached as an addendum to the Testing Agreement titled "Packaging Specifications." *Id.* at PageID.276.

After receiving the AGR testing results, the Parties disagreed as to whether those results called for the next step, the sample bottle run described in Section 4, to be implemented. Defendant argues that under several tests performed by AGR, the bottles fell below industry standards or otherwise failed the testing protocol, meaning the bottles did not "pass

3

the tests" as defined in Section 4. Therefore, Defendant maintains that it is not obliged under Section 4 to conduct a sample bottle run. Plaintiff counters that the AGR report indicates the bottles meet all the parameters listed on the Specifications document, and that therefore the condition of Section 4 has been met and Defendant must require Yoshida to conduct a bottle run.

Plaintiff originally filed this lawsuit in state court to compel Defendant to engage in the bottle run. ECF No. 1. Defendant timely removed to federal court and filed an Answer (ECF No. 4), after which Plaintiff filed an amended complaint adding counts for breach of contract. ECF No. 9. Defendant filed a new Answer. ECF No. 11. After a scheduling conference with the Court, Plaintiff was given permission to file the instant motion to resolve the narrow issue of whether Defendant is contractually obligated to proceed with the sample bottle run. The Motion is fully briefed, and the Court has determined that it will resolve it without oral argument.

## II. STANDARD OF REVIEW

In a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), district courts must take as true "all well-pleaded material allegations of the pleadings of the opposing party." *Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 578 (6th Cir. 1973). A motion for judgment on the pleadings uses the same standard as for a motion to dismiss under Rule 12(b)(6). *Warriors Sports, Inc. v.*

4

*National Collegiate Athletic Ass'n.*, 623 F.3d 281, 284-85 (6th Cir. 2010). The motion may be granted "only if the moving party is nevertheless clearly entitled to judgment." *Id*. But courts "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). "A Rule 12(c) motion 'is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991). Where, as here, the motion is filed by the plaintiff, the Court assumes to be true all material allegations of fact in the defendant's answer, and also considers all undenied factual allegations in the plaintiff's complaint. *Lowden v. Cnty. of Clare*, 709 F. Supp. 2d 540, 546 (E.D. Mich. 2010).

Consideration of a motion under Rule 12(b)(6) or Rule 12(c) is generally confined to the pleadings. *See Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Courts may, however, consider any exhibits attached to the complaint or the motion to dismiss "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). The exhibits attached by the parties in this case satisfy those parameters.

### III. ANALYSIS

**A. Contract language**

Sitting in diversity, federal courts apply the substantive law of the forum state in which they are located. *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012). To resolve this matter, the Court will therefore apply Michigan principles of contract interpretation.

A threshold question in contract interpretation is whether the contract, as relevant to the disputed issues, is ambiguous. This is a question of law, as is the meaning of the contract if it is clear and unambiguous. *Port Huron Educ. Ass'n, MEA/NEA v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996). If the contract language is "unclear or susceptible to multiple meanings, interpretation becomes a question of fact" and judgment on the pleadings is inappropriate. *Id.* To assess whether a contract is ambiguous, courts must begin with the "plain language" of the contract and construe it according to its "plain and ordinary meaning." *Alexander Assocs., Inc. v. FCMP, Inc.*, No. 10-12355, 2012 WL 1033464, at *7 (E.D. Mich. Mar. 27, 2012) (quoting *Dillon v. DeNooyer Chevrolet Geo*, 550 N.W.2d 846, 848 (Mich. Ct. App. 1996)). Courts are cautioned to not artificially narrow the scope of their review: they must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003).

6

Here, resolving the central dispute requires interpreting the "if-then"-style provision in Section 4. The "plain language" is straightforward: if the bottles provided "pass the tests," MJS "shall provide Yoshida" with the specified sample of bottles such that "a sample bottle run can be performed." The answer to the question of what it means to "pass the tests" is provided by the terms of the contract itself. It says: "To the extent bottles from a given cavity/production date pass the tests to be performed by AGR (that is, meet the Specifications), then . . ." the test run will be conducted.[1]

It is undisputed that the term "Specifications" as used in this paragraph refers to the document titled "Packaging Specifications" that was appended to the Testing Agreement. *See* Resp. at n.2, ECF No. 18, PageID.326 (referencing a figure listed on the "Packaging Specifications" document and referring to it as being written in the "Specifications"). This language is therefore clear and unambiguous. The phrase "that is" indicates that the parenthetical is defining what it means to "pass the tests." Once that condition has been met, MSJ "shall provide Yoshida" with bottles "so that a sample bottle run can be performed." ECF No. 16,

---

[1] Specifically, MJS is to provide six pallets of bottles from an even sample of all the passing cavities/production dates for a test run. A "cavity" is the space in a production mold where the desired product (here, glass bottles) is shaped. Any structural infirmity could be related to some sort of defect with a specific cavity; therefore, MJS was required to provide bottles from a range of cavities to AGR for testing, as described in Section 2 of the Testing Agreement.

7

Case 2:21-cv-10230-TGB-RSW ECF No. 21, PageID.425 Filed 12/17/21 Page 8 of 11

PageID.273. Defendant does not identify any Specifications that were not met in the AGR testing results; based on the evidence available at this time, the condition has been met and the sample run must be conducted.

Defendant argues that the meaning of "pass the tests" cannot be so narrowly construed as to only mean "meet the Specifications" because it would render large parts of the Testing Agreement surplusage. ECF No. 18, PageID.335-38. Specifically, Section 1 of the Testing Agreement describes four sets of tests: Surface Protection Evaluation, Dimensional, Thermal Shock, and Internal Pressure Testing. ECF No. 16, PageID.271. And it is true that the testing subsequently undertaken by AGR, as described in Section 1 of the Testing Agreement, measured certain characteristics of the bottles that were not described in the "Specifications" document. If "pass the tests" means "meet the Specifications," the performance of the bottles on those tests that do not relate to the "Specifications" has no bearing on whether the sample run is eventually required. Defendant argues that if this were the case, there would have been no need to detail so many different tests to be performed.

But the introductory paragraph of Section 1 states that the testing described "shall be for diagnostic purposes and not for acceptance purposes." *Id*. "Diagnostic purposes" means, as Section 1 states, "to diagnose the cause of glass breakage," not to decide whether or not the bottles should be accepted. Section 1 goes on to make it clear that the

8

"results of the testing will be binding and final on the Parties for purposes of deciding whether to undertake the test bottling run described in § 4 below." Section 4 of the Testing Agreement then defines which of the "results of testing" will determine whether the sample bottle-run will be undertaken. According to that section, if the bottles pass the tests performed by AGR by meeting the Specifications, then the test bottling run will be conducted. In short, only certain tests have a bearing on this outcome; other tests are meant to be diagnostic.

The fact that AGR was required by the terms of the Agreement to perform tests which examined characteristics of the bottles not mentioned in the Specifications does not change this outcome. By clearly equating "passing the tests" with "meeting the Specifications" the parties chose to make the results of only certain tests determinative in binding them to conduct a test run. The other tests, although seemingly helpful in diagnosing the potential cause of breakages, were not included in defining the condition precedent for requiring a test run to be conducted. Therefore, the Court does not find that the language detailing the tests to be performed is surplusage under the plain reading of the contract already described.

In coming to this conclusion, the Court does not rely on any of Plaintiff's allegations that Defendant has denied or countered. *See* Resp., ECF No. 18, PageID.329-32. Parties do not dispute that this contract

9

controls the dispute at hand, and the contract can be interpreted based on its plain language alone.

### B. Remedy

Defendant argues that even if the Court finds the contract language to compel a sample bottle run, ordering it to do so is inappropriate because the availability of an adequate remedy at law—here, damages—prohibits the Court from ordering specific performance. ECF No. 18, PageID.338-39.

A party seeking specific performance must allege and prove an inadequate remedy at law. *Bazzy v. IndyMac Mortg. Servs.*, No. 09-CV-13436, 2010 WL 707371, at *4 (E.D. Mich. Feb. 23, 2010) (citing *JP Morgan Chase Bank, NA v. Winget*, 510 F.3d 577, 584 (6th Cir. 2007)). For example, it could be shown that "the legal remedy of damages is impracticable." *Ruegsegger v. Bangor Twp. Relief Drain*, 338 N.W.2d 410, 411 (Mich. Ct. App. 1983). Impracticability includes circumstances where damages cannot be measured with a "sufficient degree of certainty." *Id.* (quoting 4 Pomeroy, Equity Jurisprudence (5th ed), § 1401, p. 1034).

Here, the Testing Agreement provides a one-way roadmap once the bottles are found to have met the Specifications: MJS must provide bottles so that Yoshida can do a sample bottle run at its facility. Based on the outcome of that test run, Pure Steeps must either accept delivery of the bottles, or MJS must compensate for the test run (and presumably keep or dispose of the bottles). There is no way to calculate damages that

10

would adequately compensate Plaintiff for Defendant's failure to conduct the test run, because the calculation of what, if any, damages Plaintiff might be entitled to receive would depend on the *result* of the test run. Because the remedy of damages is insufficient given the context of the contract breach alleged, the Court finds that specific performance is the appropriate remedy.

## CONCLUSION

The unambiguous language of the contract supports Plaintiff's reading, and the Motion for Partial Judgment on the Pleadings is **GRANTED**. Defendant is **ORDERED** to move forward with the sample bottle run as outlined in Section 4 of the Testing Agreement.

**SO ORDERED,** this 17th day of December, 2021.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge